Thomas Myers (SBN 120674)
Email: myers@smithmyerslaw.com
SMITH & MYERS LLP
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: 213.613.2380
Facsimile: 213.613.2395

Stephen B. Edwards*
PA Attorney I.D. No. 326453
Email: sbedwards@fairnesscenter.org
Nathan J. McGrath*
PA Attorney I.D. No. 308845
Email: njmcgrath@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street Suite 600
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001
Facsimile: 717.307.3424

*Pro hac vice application to be filed

Attorneys for Plaintiff Isaac Newman

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC NEWMAN, <br><br> Plaintiff, <br><br> v. <br><br> ELK GROVE EDUCATION ASSOCIATION, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

1

# INTRODUCTION

1. This case is about a teachers' union creating a seat on its executive board that is only open to members of certain racial groups, in direct violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII"), and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900–12951, 12927–12928, 12955–12956.1, 12960–12976 ("FEHA").

2. The Elk Grove Education Association ("EGEA" or the "Union"), which represents teachers and other certificated employees of the Elk Grove Unified School District ("District") in Sacramento, California, recently created a position called the "BIPOC At-Large Director" on its executive board ("BIPOC Position").

3. This position comes with all the rights and privileges of being an EGEA board member, but under EGEA's bylaws, only persons who "self-identify" as "African American (Black), Native American, Alaska Native, Native Hawai'ian, Pacific Islander, Latino (including Puerto Rican), Asian, Arab, and Middle Eastern," can run for the position.

4. Plaintiff Isaac Newman ("Newman") is a white EGEA member who wants to run for union office to address the District's recent adoption of what he believes to be aggressive and unnecessary Diversity, Equity & Inclusion ("DEI") policies.

5. But as a white person, he is racially disqualified from filling the BIPOC Position, which means he has categorically fewer opportunities to attain union office than non-white EGEA members.

6. By drawing arbitrary racial lines between its members, EGEA has flagrantly violated Title VII and FEHA, both of which prohibit racial discrimination by labor organizations. *See* 42 U.S.C. § 2000e-2(c)(1); Cal. Gov't Code § 12940(b).

7. Accordingly, this Court should declare the BIPOC Position unlawful, enjoin EGEA from creating any similar positions in the future where candidate eligibility is, in whole or in part, based on race, and enter judgment in Newman's favor.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over Newman's Title VII claim pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

9. This Court has supplemental jurisdiction over Newman's FEHA claim pursuant to 28 U.S.C. § 1367(a).

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the sole Defendant resides in this District.

**PARTIES**

11. Plaintiff Isaac Newman is a high school history teacher at Florin High School ("Florin HS"), which is a school under the authority and control of

the District. As a person of white/Caucasian descent, Newman does not identify as a member of any of the racial categories eligible to run for the BIPOC Position.

12. Defendant EGEA is a labor union affiliated with the California Teachers Association ("CTA") and the National Education Association ("NEA"). EGEA and the District have entered into a collective bargaining agreement ("CBA") that recognizes EGEA as the exclusive collective bargaining representative of teachers employed by the District. An authentic copy of relevant portions of the CBA is attached hereto as "Exhibit A," and incorporated by reference herein.

## PROCEDURAL BACKGROUND

13. Before filing suit, Newman exhausted his administrative remedies with the United States Equal Employment Opportunity Commission ("EEOC") and the California Civil Rights Department ("CRD").

14. On April 23, 2024, the EEOC and the CRD each issued a Notice of Right to Sue, authentic copies of which are attached hereto as "Exhibit B," and incorporated by reference herein.

15. Newman has filed this complaint within 90 days of receiving his Notice of Right to Sue, as required by 42 U.S.C. § 2000e-5(f)(1).

## FACTUAL ALLEGATIONS
### EGEA Governance Structure

16. EGEA is governed by two elected bodies: the Executive Board and the Representative Council.

17. Broadly speaking, the Representative Council formulates policy objectives for EGEA that the Executive Board then implements.

18. While subject to policies set by the Representative Council, the Executive Board also possesses significant power and discretion in conducting EGEA's day-to-day business.

19. For example, EGEA's bylaws empower the Executive Board to "direct the bargaining . . . [and] grievance activities of the Association." EGEA Bylaws Art. IX(E)(8)–(9). An authentic copy of the Bylaws is attached hereto as "Exhibit C," and incorporated by reference herein.

20. Additionally, while the Representative Council is primarily composed of elected representatives from defined faculty groups, every member of the Executive Board is also a member of the Representative Council. Ex. C, Art. VI(B)(1).

21. The Executive Board consists of the following positions, all of which are chosen by general election of the EGEA membership:

    a. The President, Vice President, and Secretary-Treasurer of EGEA;

    b. Eleven (11) "At-Large Directors," nine of whom represent specific educational levels like "Middle School" and "Special Education," one of whom is the "Member-at-Large Director," and one of whom is the "BIPOC At-Large Director."

### The "BIPOC At-Large" Executive Board Position

22. In March 2023, the Executive Board presented a proposal to the Representative Council to create a "BIPOC At-Large" position ("BIPOC Position") on the Executive Board. An authentic copy of the BIPOC Position Proposal is attached hereto as "Exhibit D," and incorporated by reference herein.

23. The proposal indicated that the individual filling the BIPOC Position would be responsible for "address[ing] the racial equity needs of all EGEA members" but would also have the same rights and duties as other members of the Executive Board. Ex. D at 1.

24. The proposal explicitly limited eligibility for the BIPOC Position to individuals who "self-identif[y] as a member of one or more of the racial/ethnic categories of Latinos (including Puerto Ricans), African Americans, Asian Americans, Arab and other Middle Eastern Americans, Native Americans, Native Hawai'ians and other Pacific Islanders, and Alaska Natives."[1] *Id.*

25. At a meeting held on April 4, 2023, the Representative Council voted to approve creation of the BIPOC Position.

26. To effectuate this decision, the Council had to amend the portion of EGEA's bylaws that structures the Executive Board.

/ / /

---

[1] Hereinafter, this series of racial/ethnic categories will be abbreviated as "BIPOC categories."

27. CTA Standing Rules require local affiliates like EGEA to submit proposed bylaw changes to CTA for review and to read the proposed amendments aloud at two subsequent Council meetings.

28. The first reading occurred at a Council meeting held on October 3, 2023.

29. CTA approved the proposed changes to EGEA's bylaws at some point before this date.

30. The second reading occurred at a Council meeting held on November 7, 2023.

31. At this meeting, the Council held another vote to approve the bylaw amendments creating the BIPOC Position, which made them final and binding as of November 7, 2023.

32. Consistent with the original proposal, the amended bylaws place explicit racial limits on eligibility for the BIPOC Position. Ex. C, Art. IX(C)(6) ("The BIPOC At-Large Director shall be a self-identified member of one or more of the [BIPOC categories].").

**EGEA Election to Fill the BIPOC Position**

33. On November 9, 2023, EGEA leadership sent an email to members announcing a special election to fill the newly created BIPOC Position.

34. Candidates for the position had to be nominated or nominate themselves through a form included with the email ("Nomination Form"). An

authentic copy of the Nomination Form is attached hereto as "Exhibit E," and incorporated by reference herein.

35. The Nomination Form contained a section requiring the nominating party to affirm that the nominee is a member of one of the BIPOC categories. Ex. E at 2 ("The BIPOC At-Large Representative position is open to EGEA members who are a self-identified member of one or more of the following racial/ethnic categories . . . Check below to confirm that the nominee above fits this description.").

36. EGEA also required candidates to submit a biographical sketch introducing themselves to potential voters.

37. EGEA indicated voting in the special election would take place from December 13–22, 2023.

**Newman is Racially Disqualified from Running for the BIPOC Position**

38. As a longtime educator with the District, Newman is disturbed by its recent adoption of various DEI practices that he believes distract from the District's core function of educating students.

39. Newman believes EGEA has supported and contributed significantly to these DEI efforts and has accordingly lost sight of its primary role as an advocate for teachers.

40.  To have a voice in these policy shifts by both the District and EGEA, Newman sought to run for the BIPOC position in the December 2023 special election.

41.  In preparation for declaring his candidacy, Newman typed multiple drafts of the required biographical sketch and sent them to friends for proofreading.

42.  Newman also discussed his potential candidacy with family and friends in numerous conversations.

43.  Ultimately, however, Newman was prohibited from submitting his name as a candidate because he was unwilling to falsely affirm that he identifies as a member of the BIPOC categories, as required by the Nomination Form.

44.  EGEA proceeded with the special election in December 2023 and its members selected Gia Moreno Cruz, a person who self-identifies as being of Native American and Chicana descent, to fill the BIPOC position.

45.  To this day, Newman has an ongoing desire to attain union office as a means of pushing back against EGEA's and the District's deepening involvement with DEI.

//

//

//

**Interstate Commerce**

46. Title VII's prohibition against racial discrimination applies to "labor organization[s] engaged in an industry affecting commerce . . . ." 42 U.S.C. § 2000e(d).

47. The statute defines "industry affecting commerce" as "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce . . . and further includes any governmental industry, business, or activity." 42 U.S.C. § 2000e(h).

48. In addition to this broad definition, Title VII provides that a labor organization "shall be deemed to be engaged in an industry affecting commerce" if it has fifteen or more members and is "acting as the representative of employees of an employer . . . engaged in an industry affecting commerce . . . ." 42 U.S.C. § 2000e(e)(2).

49. EGEA has more than fifteen members.

50. EGEA represents teachers and all other "certificated employees" of the District. *See* Ex. A at 2  (recognizing EGEA "as the exclusive representative of all certificated employees of the Elk Grove Unified School District").

51. As a government employer, the District qualifies as an "employer . . . engaged in an industry affecting commerce," 42 U.S.C. § 2000e(e)(2), because Title VII defines "industry affecting commerce" to include "any ***governmental*** industry, business, or activity." 42 U.S.C. § 2000e(h) (emphasis added).

52. Accordingly, because it represents employees of an employer that is definitionally "engaged in an industry affecting commerce," EGEA has the requisite connection to interstate commerce to bring it within Title VII's purview. 42 U.S.C. § 2000e(e)(2).

53. Furthermore, even if Title VII did not specifically presume that government employers are engaged in an "industry affecting commerce," the District would nonetheless satisfy the Statute's broad definition of that term. 42 U.S.C. § 2000e(h).

54. The District and its agents regularly engage in numerous activities that affect interstate commerce, including but not limited to:

 a. Procurement of educational materials and equipment from suppliers outside California;

 b. Procurement of cafeteria food from national vendors;

 c. Contracting with out-of-state vendors for employee training and information technology services; and

 d. Sending teachers and administrators on interstate trips to observe educational practices and techniques at school districts around the country.

55. The District purchases textbooks from publishers outside California, including New York-based W.W. Norton & Co.

56. The District purchases teacher desks from the HON Company, an Iowa-based company with manufacturing facilities in Iowa and Georgia.

57. The District has contracted with numerous out-of-state providers of online learning services, including Newsela, a New York-based company whose platform adapts news stories to different student reading levels, and ProQuest, a Michigan-based provider of online educational databases.

58. During the 2022–2023 school year, the District contracted with the Utah-based Arbinger Institute to provide training on leadership and workplace culture at Florin HS.

59. The District also relies on out-of-state vendors for various electronic devices, including desk phones from MiTel, a Canadian company, and classroom clocks from Sapling, which is based in Pennsylvania.

60. The District sources cafeteria food from national brands like Smucker's and Cool Tropics that are headquartered outside California and have extensive interstate operations.

61. Finally, the District periodically pays for interstate travel by administrators and teachers, usually for the purpose of learning new educational techniques and methods.

62. Examples of this travel include an October 2022 trip to observe aspects of the Nashville, Tennessee public school system and a September 2023 trip to the Ron Clark Academy in Atlanta, Georgia.

63. In addition to its connection with the District, EGEA is also "engaged in an industry affecting commerce" by virtue of its affiliation with CTA and NEA.

64. Title VII deems a labor organization to be "engaged in an industry affecting commerce" if it "has been chartered by a labor organization representing or actively seeking to represent employees [of an employer engaged in an industry affecting interstate commerce] as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization . . . ." 42 U.S.C. § 2000e(e)(4).

65. EGEA "has been chartered by" CTA, which is a statewide "labor organization representing or actively seeking to represent" employees of California public schools. 42 U.S.C. § 2000e(e)(4); *see also* Ex. B, Art. III.A (providing that EGEA "shall be a chartered chapter of the California Teachers Association").

66. EGEA is similarly affiliated with NEA, which represents educators nationwide. *See* Ex. B, Art. III.B. (providing that EGEA "shall be an affiliate local association of the National Education Association").

67. The public schools whose employees CTA and NEA "represent[] [and] seek[] to represent" have interstate activities similar to the District, in that they rely on out-of-state vendors and suppliers to facilitate their daily operations. 42 U.S.C. § 2000e(e)(4).

68. Thus, by virtue of its connection to these organizations, EGEA "shall be deemed to be engaged in an industry affecting commerce . . . ." *Id.*

## CLAIMS FOR RELIEF

## COUNT ONE

**Violation of Title VII of the Civil Rights Act of 1964 – Racial Discrimination by Labor Organization – 42 U.S.C. § 2000e-2(c)**

69. Title VII of the Civil Rights Act of 1964 makes it unlawful for a "labor organization" to "discriminate against . . . any individual because of his race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(c)(1).

70. Under this provision, labor unions "may not limit eligibility for [union] office to persons of a particular race . . . ." 29 C.F.R. § 452.46; *see also Shlutz v. Loc. 1291, Int'l Longshoremen's Ass'n*, 338 F. Supp. 1204, 1207–08 (E.D. Pa. 1972), *aff'd*, 461 F.2d 1262 (3d Cir. 1972).

71. Regrettably, EGEA has done exactly that by creating the BIPOC Position, a union board seat with express racial eligibility criteria. *See* Ex. B, Art. IX(C)(6) ("The BIPOC At-Large Director shall be a self-identified member of one or more of the [BIPOC categories].").

72. As such, EGEA unlawfully "discriminate[d] against [Newman] because of his race" by creating a position on its Executive Board for which he is racially disqualified because he is white. 42 U.S.C. § 2000e-2(c)(1).

73. Newman intended to run for the BIPOC Position in the December 2023 special election but was prohibited from doing so by EGEA's race-based eligibility criteria.

74. Thus, EGEA deprived Newman of a specific opportunity to run for an Executive Board seat based on the color of his skin.

75. Furthermore, the existence of the BIPOC position constitutes ongoing unlawful discrimination because it permanently damages Newman's future prospects of attaining a union leadership role.

76. As currently constituted, EGEA's Executive Board has 14 seats, including the BIPOC Position. Ex. B, Art. IX(A).

77. EGEA's bylaws place racially neutral limitations on who may run for the "Special Education At-Large" and "Member-at-Large" seats. *Id.*, Art. IX(C)(4) ("The Special Education At-Large Director must hold a caseload position servicing special education students . . . ."); *Id.*, Art. IX(C)(5) ("The Member-at-Large Director must hold a district position other than classroom teacher . . . .").

78. Thus, at present, a person who self-identifies as being of BIPOC descent may run for any of the 14 seats for which she is eligible based on her job description, but a white individual such as Newman is only eligible for 13 of the seats. *See* Ex. B, Art. IX(C)(6) ("The BIPOC At-Large Director shall be a self-identified member of one or more of the [following] racial categories . . . .").

COMPLAINT
15

79. The existence of the BIPOC position unlawfully places white individuals such as Newman in a segregated class of persons who have fewer opportunities to attain leadership roles within EGEA.

80. To further his goal of addressing the District's and EGEA's adoption of DEI policies, Newman has an ongoing desire to attain union office but is limited in his ability to achieve that objective by EGEA's decision to create a racially divided Executive Board.

## COUNT TWO

**Violation of the California Fair Employment and Housing Act – Racial Discrimination by Labor Organization – Providing Second-Class or Segregated Membership – Cal. Gov't Code § 12940(b)**

81. Like Title VII, FEHA prohibits a "labor organization" from "discriminat[ing] . . . against any of its members" on the basis of protected characteristics, including race. Cal. Gov't Code § 12940(b).

82. FEHA also specifically prohibits "discriminat[ion] against any person because of . . . race . . . in the election of officers of the labor organization . . . ." *Id.*

83. FEHA additionally prohibits labor organization from "provid[ing] . . . second-class or segregated membership" based on race. *Id.*

84. EGEA violated all three of these clauses by creating the BIPOC Position.

85. By racially disqualifying all white persons from running for the BIPOC Position, EGEA has discriminated against Newman "in the election of officers of the labor organization" based on his race. *Id.*

86. Additionally, the racially segregated composition of EGEA's Executive Board subjects Newman to "second-class or segregated membership" in that, as a white person, EGEA provides him with fewer opportunities to attain union office than persons of BIPOC descent. *Id.*

87. To further his goal of addressing the District's and EGEA's adoption of DEI policies, Newman has an ongoing desire to attain union office but is limited in his ability to achieve that objective by EGEA's decision to create a racially divided Executive Board.

prayer for relief

WHEREFORE, Newman asks that this Court:

A. Declare that EGEA's creation of the BIPOC Position violated Title VII and FEHA's prohibitions against racial discrimination by labor organizations, 42 U.S.C. § 2000e-2(c)(1), Cal. Gov't Code § 12940(b), and that the continued existence of the BIPOC Position constitutes ongoing, unlawful racial discrimination;

B. Order EGEA to amend its bylaws to either remove all race-based eligibility criteria for the BIPOC Position or eliminate the position altogether;

C. Enter an injunction prohibiting EGEA from creating any future elected offices limited to persons of particular racial groups;

D. Award Newman compensatory and nominal damages based on Defendants' violations of Title VII and FEHA;

E. Award Newman attorney's fees and costs pursuant to Title VII and FEHA as the "prevailing party" in this action, 42 U.S.C. § 2000e-5(k), Cal. Gov't Code § 12965(c)(6);

F. Award Newman punitive damages under Title VII and FEHA based on racial discrimination by EGEA that was willful, malicious, and/or recklessly indifferent to Newman's statutorily protected rights, 42 U.S.C. § 1981a(a)(1), Cal. Civ. Code § 3294(a); and

G. Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

Date: 5/24/2024        By /s/ Thomas Myers
                              Thomas Myers

                Attorney for Plaintiff Isaac Newman